**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

Plaintiff,

v. No.15-CR-01893 MV

STEVEN MORALES,

Defendant.

---

*Appearances:*
*For the United States:*
DAMON P. MARTINEZ
United States Attorney
201 3rd Street NW
Suite 900
Albuquerque, NM 87114

*By:* SAMUEL A. HURTADO
Assistant United States Attorney
United States Attorney's Office
P.O. BOX 607
Albuquerque, NM 87103

*For the Defendant:*
JASON BOWLES
BOWLES LAW FIRM
P.O. BOX 25186
Albuquerque, NM 87125

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Steven Morales's pending Motion to Suppress Evidence (the Motion) related to his arrest in a parked vehicle in which Mr. Morales was seated. [Doc. 23]. The United States responded to the Motion [Doc. 24], and Mr. Morales replied [Doc. 26]. The United States moved to amend their briefing on April 11 [Doc. 28], and the Court granted the United States' request [Doc. 29]. The United States submitted

amended briefing on April 14 [Doc. 30], to which Mr. Morales did not respond. The Court held a hearing on this motion on April 27, 2016 and ordered that the parties submit their closing arguments in writing [*see* Doc. 31]. The parties submitted their written closing arguments on May 9 [Doc. 32] and May 11, 2016 [Doc. 33].

The Court, having considered the motions, briefs, relevant law, arguments, and being otherwise fully informed, finds that Mr. Morales's Motion will be **GRANTED**.

## BACKGROUND

On January 28, 2015, Mr. Morales was riding in his father's Mazda with his father, Arturo Morales, and sister, Carol Sifuentes, when Mr. Morales's father pulled the car into the Smith's parking lot on Golf Course Rd. in Albuquerque. Doc. 23, Suppression Mot., at 2; Doc. 30, Amended Opp. to Suppression Mot., at 2. At that time, Mr. Morales was wanted on murder-related charges in Grant County, New Mexico, and the Sixth Judicial District Court for the State of New Mexico had issued an arrest warrant for Mr. Morales. Doc. 23, Suppression Mot., at 2; Doc. 30, Amended Opp. to Suppression Mot., at 1. Unbeknownst to Mr. Morales, the Sixth Judicial District Court for the State of New Mexico had also issued an order to Mr. Morales's telecommunications provider to disclose Mr. Morales's cellphone data to law enforcement. Doc. 30, Amended Opp. to Suppression Mot., at 1–2. This data appears to have been used to determine Mr. Morales's GPS location. *Id.*

By the afternoon of January 28, 2015, a law enforcement taskforce had been mobilized to search for Mr. Morales. April 27, 2016 Hr., at 9:50 am. That taskforce included several deputies of the U.S. Marshal Service, including Deputy U.S. Marshal Chis Roberson and Deputy U.S. Marshal Ben Segotta, who testified regarding Mr. Morales's arrest. On the day in question, the

Marshals had been sent a "Google map plotting . . . [which gave them Mr. Morales's] GPS location . . . inside the [Smith's] parking lot." Deputy Segotta testified that it was only this GPS information, and no other information, that prompted him to converge on the Smith's parking lot where Mr. Morales was located. *Id.*, at 10:25–26, 10:35 am. Upon cross examination, Deputy Segotta testified that he was not the taskforce officer who identified Mr. Morales's GPS location using Mr. Morales's telephone data. Instead, Deputy Segotta was simply following the GPS location that had been emailed to him by the taskforce, which he believed to be accurate. *Id.*, at 10:18–23, 10:28 am. Deputy Segotta did not know how the U.S. Marshals were receiving the telephone data, what types of devices were receiving the data, the scope of the data the U.S. Marshals were authorized to receive, or how the data was used to identify Mr. Morales's location. *Id.*, at 10:28–30 am.

Based on the GPS data received, Deputy Segotta proceeded to the parking lot and parked less than 15 feet from the vehicle containing Mr. Morales. *Id.*, at 9:58 am. However, Deputy Segotta could not see Mr. Morales because Mr. Morales was concealed in the backseat of a parked Mazda. *Id.*, at 10:04–07 am. Deputy Segotta continued to survey the area the taskforce had identified for him, when he noticed that the two visible occupants of the vehicle, Mr. Morales's father and sister, Ms. Sifuentes, remained sitting in the vehicle for ten minutes without exiting it. *Id.*, at 10:37 am. At that point Deputy Segotta could see the driver of the vehicle, Mr. Morales's father, Arturo Morales, and the taskforce had been informed that Arturo Morales had

been involved in Mr. Morales's attempts to evade law enforcement. *Id.*, at 9:58–10:00 am.[1] Deputy Segotta's view of Mr. Morales's father was obscured and limited to a fraction of his profile when he made the identification and, as a result, it is extremely unlikely that he could have made the identification without knowing Mr. Morales and his father were nearby based on the GPS location provided by the taskforce. *See id.*, at 10:31–32, 10:43–45 am. Deputy Segotta could also see a "Jack Key Motors" placard on the car, which indicated to Deputy Segotta that the vehicle had been purchased from Jack Key Motors in Las Cruces, where the alleged actions giving rise to the arrest warrant took place. *Id.*, at 10:00–02 am. Deputy Segotta also saw Ms. Sifuentes, seated in the front passenger seat of the vehicle, hand a cellphone back into the back seat, where a tattooed arm reached up and grabbed it.[2] *Id.*, at 10:03–07 am. This tattooed arm seemed by Deputy Segotta to belong to Mr. Morales. *Id.* After Ms. Sifuentes handed Mr. Morales the cellphone, Ms. Sifuentes and Mr. Morales's father exited the Mazda and entered the Smith's, while Mr. Morales remained sitting in the back seat of the car in the parking lot. *Id.*, at 10:10 am.

After Ms. Sifuentes and Mr. Morales's father had left the area, Deputy Segotta issued a positive identification of Mr. Morales based on the taskforce's GPS location, the tattoos, and the potential identification of Mr. Morales's father. *Id.*, at 10:39–41, 10:57 am; Doc. 30, Amended Opp. to Suppression Mot., at 2. Following the Marshals' identification of Mr. Morales, an

---

[1] The task force also provided a photo of Mr. Morales's father, which assisted Deputy Segotta in making a positive identification. April 27, 2016 Hr. on Suppression Mot., at 10:11 am. The United States never produced a copy of the GPS map identifying Mr. Morales's location or of the photograph used to identify Mr. Morales's father. *Id.*, at 10:17–18 am.

[2] It is unclear if this is the cellphone the U.S. Marshals used to identify Mr. Morales.

unknown taskforce member issued an order to arrest Mr. Morales, April 27, 2016 Hr. on Suppression Mot., at 11:24 am; Doc. 30, Amended Opp. to Suppression Mot., at 2, and Deputy Roberson proceeded to arrest Mr. Morales in the Smith's parking lot. *Id*. It is undisputed that the arresting officers conducted their arrest as soon as they approached the car with weapons drawn, without further verifying Mr. Morales's identification. Amended Opp. at 2; Mot. at 2; Hr. at 10:58–11:02, 11:25, 11:27 am (the intention on making contact with Mr. Morales was "to take him into custody . . . to arrest him . . . [on the basis that] there was an active warrant.").[3] Deputy Roberson handcuffed and patted down Mr. Morales, which produced no results. Doc. 23, Suppression Mot., at 2; Doc. 30, Amended Opp. to Suppression Mot., at 2. Mr. Morales volunteered that he had money in his pocket, and when Deputy Roberson searched the pocket, he discovered both money and a single round of .45 caliber handgun ammunition. Doc. 23, Suppression Mot., at 2–3; Doc. 30, Amended Opp. to Suppression Mot., at 2. The arresting officers found no weapons in the vehicle or on Morales. Doc. 23, Suppression Mot., at 3; Doc. 30, Amended Opp. to Suppression Mot., at 2–3.

ATF Officer Wolfe then arrived on the scene. The United States asserts, and Mr. Morales does not challenge, that Officer Wolfe read Mr. Morales his *Miranda* rights. Doc. 30, Amended Opp. to Suppression Mot., at 3. Upon interrogation, Mr. Morales then discussed with Officer Wolfe the possession of the handgun bullet. Doc. 30, Amended Opp. to Suppression

[3] On cross-examination, Deputy Segotta stated that he believes that at some point prior to taking Mr. Morales to jail, Mr. Morales's identity was confirmed, but Deputy Segotta had no information on which to base this belief. April 27, 2016 Hr. on Suppression Mot., at at 11:03 am.

Mot., at 3. On May 19, 2015, Mr. Morales was indicted on the sole count of possessing a single round of .45 caliber ammunition as a felon. Doc. 2, Indictment, at 1.

Mr. Morales challenges the basis for identification used by the arresting officers in identifying him as the individual specified in the arrest warrant. He moves to suppress the bullet found and other results of the search on the basis of his unjustifiable identification as the Mr. Morales specified in the warrant. Doc. 23, Suppression Mot., at 6–8. Mr. Morales does not challenge the arrest warrant as improperly issued, nor does he argue that the officers lacked probable cause to seek the warrant in the first instance. *See id.*, at 6–8. At the time Mr. Morales submitted his Suppression Motion, he did not know that he had been identified through his telephone data because the information was not included in the police report of the arrest or any other document productions to Mr. Morales. Doc. 30, Amended Opp. to Suppression Mot., at 1–3.

Given that Mr. Morales was not challenging the probable cause supplied for the underlying arrest warrant, but rather the basis of Mr. Morales's identification as the Mr. Morales specified in the arrest warrant, at the conclusion of the suppression hearing the Court asked the parties to submit supplemental briefing regarding the Fourth Amendment issues raised by potential misidentification in effectuating an arrest. April 27, 2016 Hr. on Suppression Mot., at 10:39–41, 11:35–37 am.

**DISCUSSION**

To suppress evidence as the result of an unlawful seizure, Mr. Morales must show: (1) that his Fourth Amendment rights were violated and (2) that there is a "factual nexus" between the violation and the evidence obtained. *United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir.

2014), *cert. denied*, 135 S. Ct. 184 (2014) (explaining that a defendant "must show that the officers violated his Fourth Amendment rights when they seized him, and that a factual nexus existed between this unlawful seizure and the discovery of the" evidence at issue). "Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).

If the Court determines that an encounter qualifies as a seizure, it must then evaluate whether or not the seizure and any attendant search were "reasonable" for the purposes of the Fourth Amendment. In *Brower v. County of Inyo*, the Supreme Court explained that a "Fourth Amendment seizure" occurs "when there is a governmental termination of freedom of movement through means intentionally applied [by the government.]" 489 U.S. 593, 597 (1989). A determination of reasonableness under the Fourth Amendment requires evaluating the nature of the encounter, whether it was supported by a reasonable suspicion, probable cause, or some alternative justification, and, often, the scope of the search in question. In the context of "police-citizen" encounters, the Tenth Circuit has articulated multiple constitutionally distinct categories of justification for seizures, including: "'(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions [Terry stops] which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and

reasonable only if supported by probable cause.'" *United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (quoting *United States v. Davis*, 94 F.3d 1465, 1467–68 (10th Cir. 1996)).

For an arrest or arrest warrant, the government must have probable cause. *See, e.g.*, *Mosley*, 743 F.3d at 1329 ("[A]n arrest . . . requires probable cause."). "A police officer has probable cause to conduct a search [or arrest] when the facts available to [her] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (internal quotation marks omitted). As with other assessments of the justifications of seizure presented by the government, "probable cause is not reducible to precise definition or quantification" and the Supreme Court has "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Id.* (internal quotation marks omitted); *cf. Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("the ultimate touchstone of the Fourth Amendment is reasonableness") (internal quotation marks omitted). Regardless of the justification presented by the government, any non-consensual seizure by the police requires "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Hauk*, 412 F.3d 1179, 1186 (10th Cir. 2005) (quotations omitted).

Importantly, the Court "may not engage in a divide-and-conquer analysis of facts to determine whether [justification for a seizure] existed" but should view all of the factors together. *United States v. Muñoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008) (internal quotation marks omitted). Thus, even factors that are also consistent with innocent behavior or have "an innocent connotation" may be considered for whatever value they add. *Id.* at 144–45. "However, neither may a court arrive at probable cause simply by piling hunch upon hunch," nor

should it ignore those factors that "militate against" a finding of probable cause. *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004).

## I. <u>The Probable Cause Requirement</u>

The parties originally briefed the issue of Mr. Morales's identification under the "probable cause" standard for a Fourth Amendment seizure pursuant to an arrest. *See* Doc. 23, Suppression Mot., at 6–8 (arguing that the arresting officers required probable cause, not only in seeking a warrant, but also in effectuating the warrant by arresting Mr. Morales). The Tenth Circuit has held that a search incident to arrest is only lawful <u>after</u> a probable cause determination is made by the arresting officer. *United States v. Sanchez*, 555 F.3d 910, 920 (10th Cir. 2009) ("the search was conducted after the arrest; but a search incident to arrest can also precede the arrest if probable cause for the arrest preceded the search (rather than being justified by the fruits of the search)").[4] Here, probable cause for the arrest existed before the arrest took place because the arrest was conducted pursuant to a valid, lawful arrest warrant. *Hill v. California*, 401 U.S. 797, 804 (1971) (applying the probable cause from the arrest warrant to a case of misidentification); *United States v. Grayson*, No. 06-CR-0086, 2006 WL 1836004, at *3–4 (N.D. Okla. June 30, 2006) (same) (citing *Hill*). In *Hill*, the Supreme Court specifically

---

[4] An officer has probable cause to arrest a suspect if the officer knows "of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Morris*, 247 F.3d 1080, 1088 (10th Cir. 2001) (citation omitted). Probable cause does not require facts sufficient for a finding of guilt; however, it does require "more than mere suspicion." *United States v. Guerrero–Hernandez*, 95 F.3d 983, 986 (10th Cir.1996) (citing *United States v. Hansen*, 652 F.2d 1374, 1388 (10th Cir.1981)).

foreclosed the application of the probable cause standard to instances of police identification after a lawful arrest warrant has been issued. *Hill*, 401 U.S. at 804.[5]

Because a lawful arrest warrant had already been issued for Mr. Morales in this case, the question for the Court to decide under Mr. Morales's motion challenging his identification was whether the U.S. Marshals had an adequate justification for identifying him as the individual specified in the arrest warrant. Specifically, Mr. Morales argues that the arresting officers did not have adequate indicia identifying Mr. Morales as the individual specified in the arrest warrant at the time the arresting officers decided to arrest Mr. Morales. Doc. 23, Suppression Mot., at 7 ("law enforcement ordered the man in the back of the car to show his hands, and exit the vehicle, and handcuffed him, before confirming he was Morales.").

## II. The Challenge to Mr. Morales's Identification at the Time of Arrest

It is undisputed that when the U.S. Marshals converged on the Mazda containing Mr. Morales, the Marshals effectuated an arrest under the Fourth Amendment. *See generally* Docs. 32, 33; *Cortez v. MacCauley*, 478 F.3d 1108, 1115–16 (10th Cir. 2007) (stating that the "'use of firearms, handcuffs, and other forceful techniques' generally exceed the scope of an investigative

---

[5] At the conclusion of the April 27, 2016 hearing on this suppression, the Court informed counsel that because a lawful arrest warrant had been issued in this case, the Court did not believe that the probable cause standard also applied to the U.S. Marshals' identification of Mr. Morales as the individual specified in the arrest warrant. April 27, 2016 Hr. on Suppression Mot., at 11:35–37 am.

In their supplemental briefing, the parties agreed that a standard different than "probable cause" applied to cases of identification under an arrest warrant. Specifically, the parties agreed that the government must identify an arrestee in good faith and supply "reasonable and articulable grounds to believe that the suspect is the intended arrestee" in order to satisfy the Fourth Amendment. Doc. 32, Def. Suppl. Br., at 1; Doc. 33, US Suppl. Br., at 2 (relying on *United States v. McCray*, 468 F.2d 446 (10th Cir. 1972) and *Sanders v. United States*, 339 A.2d 373 (D.C. 1975). As a result, the parties resubmitted their arguments by analogizing the facts presented at the hearing to the alternative standard. Doc. 32, Def. Suppl. Br., at 2–5; Doc. 33, US Suppl. Br., at 2–5.

detention and enter the realm of an arrest") (quoting *Melendez-Garcia*); *United States v. Perea*, 374 F. Supp. 2d 961, 974 (D.N.M. 2005) ("when there exists no specific threat to officer safety, the Tenth Circuit refuses to consider the use of guns a reasonable exercise of precaution and considers such a stop an arrest."). Mr. Morales argues that because the arresting officers decided to arrest Mr. Morales before adequately confirming his identification, their search incident to his arrest was unlawful. Doc. 23, Suppression Mot., at 7.

As the parties agreed in their supplemental briefing, while the lawful arrest warrant satisfied the probable cause requirement for the arrest, this does not end the Fourth Amendment inquiry. Simply because an arrest warrant has been issued does not mean that a suspect's Fourth Amendment right to be free of seizure has ended. Rather, after a court issues an arrest warrant for a suspect, the police officer must additionally lawfully effectuate the arrest when they seize the arrestee. *Hill*, 401 U.S. at 804 (applying the Fourth Amendment to a search incident to arrest in a case of misidentification pursuant to a lawful arrest warrant); *see* LAFAVE, ISRAEL, KING & KERR, CRIMINAL PROCEDURE § 3.5(a) (4th ed. 2015).

Here, Mr. Morales raises a Fourth Amendment challenge to the manner in which the arresting officers identified Mr. Morales. Doc. 23, Suppression Mot., at 6–8. In order for an arrest pursuant to a warrant to satisfy the Fourth Amendment, the arresting officer must have lawfully identified the arrestee as the person specified in the warrant. *Hill*, 401 U.S. at 802 (1971). Courts have interpreted the Supreme Court precedent in *Hill* as stating that officer identifications during an arrest pursuant to an arrest warrant are lawful if the arresting officer "(1) acts in good faith, and (2) has reasonable, articulable grounds to believe that the suspect is the intended arrestee." *Sanders*, 339 A.2d at 379. Applying this reasonable, good faith

requirement, the Tenth Circuit resolved a case where the defense asserted that the FBI agent making the arrest did not know that "the McCray arrested was the McCray named in the indictment" by holding that an arrest was valid where the arresting officer knew (1) that the arrestee's name matched the name on the warrant and (2) the arrestee was in the house specified in the warrant. *See United States v. McCray*, 468 F.2d 446, 448–49 (10th Cir. 1972). More recently, the District of Colorado held that the misidentification of an arrestee pursuant to a warrant was nevertheless legal when the "age, physical description, and address" helped an officer reasonably identify a suspect as the individual named in an applicable arrest warrant. *Jama v. City & Cnty of Denver*, No. 08-CV-01693, 2010 WL 3615027, at *6 (D. Colo. Sept. 9, 2010)); *see also Grayson*, 2006 WL 1836004, at *4 (finding that in that instance, officer reliance on identifying information generated in TRACIS computer system was reasonable). Finally, in the *Sanders* case, the mistaken arrest of an individual not named in a warrant was lawful when the arrestee and the individual named in the warrant had similar names and similar descriptions. *Sanders*, 339 A.2d at 378 n.4. By contrast, if arresting officers do not have reasonable, articulable grounds to believe that the suspect is the intended arrestee, the arrest and subsequent detention violate the Constitution. *See Peterson v. Jensen*, 371 F.3d 1199, 1203 (10th Cir. 2004) (misexecution of a search warrant based on misidentification can form the basis of a Section 1983 claim); *Fairley v. Luman*, 281 F.3d 913, 917–18 (9th Cir. 2002) (finding a constitutional violation occurred where police arrested and detained an individual pursuant to a warrant that was actually issued for the arrestee's twin brother).

In the instant case, if the United States can prove that the arresting officers acted in good faith and had reasonable, articulable grounds to believe that the Mr. Morales was the arrestee

intended, the United States will have satisfied its burden. *Sanders*, 339 A.2d at 379. Here, the United States asserted that the Marshals identified Mr. Morales through GPS location, his distinctive tattoos, and because Mr. Morales appeared to be hiding. April 27, 2016 Hr. on Suppression Mot., at 10:39–41, 10:57 am; Doc. 30, Amended Opp. to Suppression Mot., at 2. As was made clear at the hearing, but for the specific GPS data submitted to Deputy Segotta identifying Mr. Morales's location, Deputy Segotta would have been unable to locate and identify Mr. Morales. April 27, 2016 Hr. on Suppression Mot., at 10:18–23, 10:28 am. Importantly, it was only this GPS location provided by the taskforce based on Mr. Morales's telephone data, and no other information, that prompted him to converge on the Smith's parking lot and identify Mr. Morales. *Id.*, at 10:25–26, 10:35 am. Mr. Morales's telephone data ultimately allowed Deputy Segotta to identify Mr. Morales by putting him within 15 feet of Mr. Morales's location. *See id.*, at 9:58, 10:28–30 am. Deputy Segotta did not know how the U.S. Marshals were receiving the telephone data, what types of devices were receiving the data, the scope of the data the U.S. Marshals were authorized to receive by the Sixth Judicial District Court for the State of New Mexico, or how the taskforce used that data to identify Mr. Morales's location. *Id.*, at 10:28–30 am.

The importance of the telephone data in this case is compounded by the circumstances surrounding the parties' filings. In its original brief in opposition to Mr. Morales's motion, the United States had incorrectly asserted that the bases of identification were Mr. Morales's tattoos and his suspicious behavior. Contrary to the United States' original briefing, the identification of Mr. Morales was fundamentally premised on the use of Mr. Morales's telephone data. *Compare* Doc. 24, Opp. to Suppression Mot., at 5 ("The officers here developed probable cause to arrest

the defendant based on the tattoos which matched the defendant's description and the defendant's actions of appearing to look around the parking lot and hide in the rear seat."), *with* Doc. 30, Amended Opp. to Suppression Mot., at 2 ("Officers arrived at the parking lot based on GPS information which indicated that the defendant may be there."). Because no mention of the telephone data was presented in documents produced to Mr. Morales in this case, Doc. 30, Amended Opp. to Suppression Mot., at 1–2, it is entirely understandable that Mr. Morales would be forced to file a motion challenging the basis of the government's identification of him to understand the events surrounding his arrest. *See generally* Doc. 23, Suppression Mot. As a result of Mr. Morales's justifiable challenge to the government's failure to correctly identify the basis of Mr. Morales's identification, the government was obligated to file amended briefing explaining the actual basis for the identification of Mr. Morales, Mr. Morales's telephone data. Doc. 28, Mot. to Amend Opp. to Suppression Mot.; Doc. 30, Amended Opp. to Suppression Mot.

Not only did the United States misinform Mr. Morales regarding the basis of his identification prior to the time Mr. Morales filed his motion, *Compare* Doc. 24, Opp. to Suppression Mot., at 5, *with* Doc. 30, Amended Opp. to Suppression Mot., at 2, but, more relevant to the Court's present inquiry, the United States did not attempt to explain how it used the telephone data to identify Mr. Morales's GPS location at the suppression hearing. Instead, the United States presented two witnesses, Deputy Segotta, who relied on the GPS location sent to him to identify Mr. Morales, and Deputy Roberson, who arrested Mr. Morales. Deputy Segotta, who was the one who alerted the taskforce that he believed he had found Mr. Morales, testified at the hearing that even though that identification was based on telephone data, he did not know how the U.S. Marshals were receiving the telephone data, what types of devices were

receiving the data, the scope of the data the U.S. Marshals were authorized to receive, or how that data was turned into a map that identified Mr. Morales's GPS location.

> Q: When you pulled in to park in that parking lot, how did you select that particular place where you parked?
>
> A: It was an empty place near where the center of the Google map, the map based off the location we receive, they give a center and then kind of work out from there. And it was close to the center of that.
>
> . . .
>
> Q: This Google Map, do you recall the dimensions of how broad the area was in the map where you were told to go?
>
> A: It was condensed to the Smith's parking lot. Because they believed that the Smith's parking lot was the highest probability within where they were identifying.
>
> Court: Excuse me, who is they?
>
> A: Sorry. The deputies that were receiving the information. So, it would have – and I don't know who specifically was getting the location from the cell phone provider. But it was being dispersed to us. So . . . I don't remember . . . which deputy was getting those and sending them to us.
>
> Court: I'm sorry, just one more clarification. And when you say deputies getting the information from the cell phone providers, are you talking Deputy Marshals?
>
> A: I believe it was a Deputy United States Marshal.
>
> Q: And, sir, you're not sure how this location was coming in, because you don't know what type of device they were using . . . you don't even know what was authorized, is that right?
>
> A: No, I don't.

April 27, 2016 Hr. on Suppression Mot., at 10:28–30 am. In addition to not producing a witness that could testify regarding how the GPS map was created or employed to enable Deputy Segotta to park his car less than 15 feet from Mr. Morales, *id.*, at 9:58 am, the United States also failed to

provide any documentary evidence regarding the GPS identification, including the map that Deputy Segotta received or the order issued in state court compelling the production of the telephone data. *See* Doc. 28, Mot. to Amend Opp. to Suppress. Mot., at 2; April 27, 2016 Hr. on Suppression Mot., at 10:17–10:19 am ("Q: You also mentioned that you had received a Google Map. Do you have a copy of that Map? A: I do not. . . . Q: So that map no longer exists? A: As far as I know.").

As stated above, the United States is not required to prove probable cause in this case. *Hill*, 401 U.S. at 804. However, the government is required to provide reasonable and articulable grounds for the identification of an arrestee. *Sanders*, 339 A.2d at 379; *see McCray*, 468 F.2d at 448–49. Implicit in this requirement is that the government be able to articulate, at a hearing before the Court, the actual basis for the identification of an arrestee. Here, the government's identification was based on unknown telephone data seized by U.S. Marshals pursuant to a state court order. The United States presented at the hearing that this data was used by unknown taskforce members using unknown methods to produce a GPS tracking location that allowed Deputy Segotta to get within 15 feet of Mr. Morales without Deputy Segotta having any other basis for knowing where Mr. Morales was. Ultimately, the United States failed to provide on what basis, if any, the GPS identification of Mr. Morales was made. As a result, the Court is unable to evaluate the factors or processes that were used to determine Mr. Morales's location and identity in order to determine whether those methods were reasonable. The United States presented no witnesses to testify regarding the functioning of the GPS identification and provided no documentation regarding the GPS identification. In short, the United States has failed to articulate the basis of its identification of Mr. Morales.

As a fallback position, the United States offers as a corroborating identification the eyewitness information taken into account by Deputy Segotta in identifying Mr. Morales. For example, Deputy Segotta recognized that the Mazda where Mr. Morales was concealed was from a dealership that had a presence in Las Cruces, in the same county where the arrest warrant was issued. April 27, 2016 Hr. on Suppression Mot., at 10:00–02 am. Deputy Segotta also noted that even from Mr. Morales's concealed position he had a sleeve tattoo. *Id.*, at 10:03–07 am. Finally, Deputy Segotta recognized that the man in the driver's seat of the Mazda might be Mr. Morales's father. *Id.*, at 9:58–10:00 am. The Court finds that this secondary identification was useful to corroborate the previous identification of Mr. Morales's GPS location. However, but for the pinpoint accuracy of that GPS identification, which placed Deputy Segotta within 15 feet of Mr. Morales's location, it is clear that Deputy Segotta never would have made this corroborating eyewitness identification. As a result, the secondary, corroborating identification cannot provide an independent basis for identifying Mr. Morales that satisfies the Fourth Amendment.

As a result of the government's failure to articulate in Court how the GPS identification of Mr. Morales was made, this Court is left with insufficient facts to support the government's contention that the identification was reasonable. The Court then draws the inevitable conclusion that the results of the identification of Mr. Morales must be suppressed.[6]

---

[6] The Court hesitates in issuing this ruling because, as far as the parties have informed the Court, despite the government's failure to explain the basis of the GPS identification, the GPS identification was accurate and the Mr. Morales arrested in fact was the Mr. Morales specified in the arrest warrant. However, it is a fundamental principle of Fourth Amendment law that the fruits of a particular Fourth Amendment search or seizure may not be used in court to justify the seizure. LAFAVE, ISRAEL, KING &

## CONCLUSION

Analysis of the relevant precedent indicates that the probable cause in this case was supplied by a valid arrest warrant issued for Mr. Morales. However, that same precedent required that an arresting officer properly identify Mr. Morales as the Mr. Morales mentioned in the arrest warrant before arresting him. Here, the government identified Mr. Morales through telephone data that the government used to produce a GPS location, but failed to articulate the basis of that identification, including the factors involved or the specific method employed in order to come up with Mr. Morales's GPS location. As a result, the United States has failed to meet the requirements of the Fourth Amendment in this case, and any evidence resulting from the identification of Mr. Morales, including the single round of .45 caliber ammunition located in Mr. Morales's pocket, must be suppressed.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence [Doc. 23] is **GRANTED.**

---

KERR, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT at § 3.2(d) (5th ed. 2015) ("It is axiomatic that hindsight may not be employed in determining whether a prior arrest or search warrant [is permissible under the Fourth Amendment.]"). The rationale for this rule is that even if suppression in a particular case allows the guilty to go free, "the immediate effect of exclusion will be to discourage law enforcement officials from violating the Fourth Amendment by removing the incentive to disregard it." *Stone v. Powell*, 428 U.S. 465, 492 (1976); LAFAVE, ISRAEL, KING & KERR, CRIMINAL PROCEDURE § 3.1(c) (4th ed. 2015) ("The exclusionary rule, as the Court put it in *Elkins v. United States*, 'is calculated to prevent, not to repair' . . . in that suppression in a particular case is intended to influence police conduct in the future, and thus the innocent and society are the principal beneficiaries.") (quotations omitted). The fact that the seizure itself corroborates that Mr. Morales appears to be the Mr. Morales identified in the warrant may not be used by this Court to support a finding in favor of the United States.

DATED this 12th day of July, 2016.

MARTHA VAZQUEZ
United States District Judge