UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                      No.15-CR-01893 MV

STEVEN MORALES,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the United States' Motion for Reconsideration of the Court's Memorandum Opinion and Order, [Doc. 37], granting Defendant Steven Morales' Motion to Suppress Evidence, [Doc. 23]. The United States moved for reconsideration of this Court's Order on August 8, 2016, [Doc. 39], and Mr. Morales opposed the United States' motion on August 18, 2016. [Doc. 47]. The Court, having considered the briefs, evidence, relevant law, arguments, and being otherwise fully informed, **GRANTS** the United States' Motion for Reconsideration and now **DENIES** Mr. Morales' Motion to Suppress Evidence.

## BACKGROUND

In light of the Court's revised interpretation of the applicable law, the facts as presented by the United States,[1] both in its filings and at the evidentiary hearing on April 27, 2016, are restated as follows.

On January 26 and 28, 2015, because Mr. Morales was wanted on an outstanding state arrest warrant, the U.S. Marshals Services obtained orders from the Sixth Judicial District Court for the State of New Mexico for disclosure of telecommunications records associated with Mr. Morales, including GPS information. [Doc. 39 at 1].

On January 28, 2015, the GPS information indicated that Mr. Morales' cell phone was in the vicinity of a Smith's grocery store in Albuquerque, New Mexico. *Id.* Members of a fugitive task force, including deputy U.S. Marshals, went to the Smith's parking lot to find and arrest Mr. Morales. *Id.*

On April 27, 2016, at an evidentiary hearing before this Court, Deputy U.S. Marshal Ben Segotta testified that upon arriving at the Smith's parking lot, he saw two people—a man and a woman—sitting in a Mazda sedan with a "Jack Key Motors" license plate frame. [Doc. 38 at 14]. The license plate frame indicated to Deputy Segotta that the car had been purchased from Jack Key Motors in Las Cruces, New Mexico. The car's origin was consistent with the information Deputy Segotta had received about Mr. Morales—that he was from southern New Mexico and had traveled to Albuquerque from Las Cruces. *Id.* at 15. Deputy Segotta saw a woman in the

---

[1] Upon close examination of Mr. Morales' motion, cross examinations at the evidentiary hearing, and supplemental briefs, the Court notes that except as discussed herein, Mr. Morales does not dispute the United States' factual presentation but rather seeks to identify deficiencies in that showing. *See, e.g.*, Doc. 23 at 1-3; Doc. 32 at 2; Doc. 38 at 25-52 (cross examination of Deputy Ben Segotta, focusing on the way officers located Mr. Morales using GPS information).

2

front passenger seat pass a cellphone to a third person in the back seat who reached up and grabbed it. *Id.* at 15–16. Deputy Segotta testified that although he could not see the person in the back seat, he saw a tattooed arm reach up and grab the cell phone, consistent with his knowledge that Mr. Morales had a "tattoo sleeve" on his arm. *Id.* at 16–18. Deputy Segotta testified that the person in the back seat "was somebody who had to have been kind of curled up and attempting to, to me, to hide." *Id.* at 47.

When the two front-seat occupants exited the car and entered the store, Deputy Segotta was able to see the driver, a man, more clearly. The task force had been informed that Mr. Morales' father, Arturo Morales, was involved in helping his son evade law enforcement. Upon comparing Arturo Morales' driver's license photo with his observations of the driver, Deputy Segotta "was confident that the photograph matched the driver of the vehicle." *Id.* at 21 and 43.

At this point, having identified Mr. Morales' father and observed someone with a tattooed arm hiding in the back seat of the car, someone in the task force issued an order to execute the arrest warrant. *Id.* at 63. At least seven task force officers moved towards the car. Deputy Chris Roberson testified that as he approached the car, he looked through the front windshield and "it looked like the subject that was—very similar descriptors, if not the subject." *Id.* Mr. Morales was arrested and during the search pursuant to his arrest, the officers recovered a single round of .45 caliber handgun ammunition. [Doc. 39 at 3].

On May 28, 2015 the United States filed a one-count indictment charging that Mr. Morales—having been convicted of several felony crimes punishable by imprisonment for more than one year—unlawfully possessed a .45 caliber cartridge in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). [Doc. 2 at 1]. On February 7, 2016, Mr. Morales filed a motion to

suppress evidence obtained during his January 28, 2015, arrest on unrelated state charges. [Doc. 23]. The United States filed a response [Doc. 24] and, following Mr. Morales' reply [Doc. 26], an amended response [Doc. 30]. On April 27, 2016, the Court held an evidentiary hearing on the motion to suppress. At the conclusion of the hearing, having clarified that Mr. Morales does not dispute that the arrest warrant gave the officers probable cause to arrest him, the Court asked the parties to submit their closing arguments in writing and to include the applicable standard of law. *See* Docs. 31; 38. In their supplemental briefings, [Docs. 32, 33], the parties agreed that in light of the valid arrest warrant for Mr. Morales, the only issue in dispute was whether the task force's identification of Mr. Morales violated the Fourth Amendment. [Docs. 32 at 1; 33 at 2]. Mr. Morales' Motion therefore challenges only the basis the arresting officers had in identifying him as the individual specified in the arrest warrant.

On July 12, 2016, this Court issued an order granting Mr. Morales' Motion to Suppress. [Doc. 37]. Following the entry of this Order, the United States moved this Court to reconsider its ruling on August 8, 2016. [Doc. 39]. Mr. Morales opposed the United States' motion on August 18, 2016. [Doc. 47].

STANDARD

"Although the Federal Rules of Criminal Procedure do not authorize a motion for reconsideration, motions to reconsider in criminal prosecutions are proper." *See, e.g., United States v. Randall*, 666 F.3d 1238, 1241 (10th Cir. 2011) (citation and internal quotations omitted). In particular, "[a] district court should have the opportunity to correct alleged errors in its dispositions." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014).

The Tenth Circuit has held that a motion to reconsider may be granted when the Court has misapprehended the facts, a party's position, or the law. *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Specific situations where circumstances may warrant reconsideration include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Id.* However, "[a] motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier." *Christy*, 739 F.3d at 539.

### DISCUSSION

The United States makes two arguments in support of its Motion for Reconsideration. First, the government argues that the Court misinterpreted the rule in *Sanders v. United States*, 339 A.2d 373 (D.C. Ct. App. 1975), which does not require the government to show how it used the GPS data to locate Mr. Morales. [Doc. 39 at 5–6]. Second, the government argues that the recent Supreme Court decision in *Utah v. Strieff*, 136 S.Ct. 2056 (2016) constitutes an "intervening change in the law" indicating that suppression was not the appropriate remedy in this case. [Doc. 39 at 10–12]. Because the Court agrees that it previously misinterpreted the rule in *Sanders*, the Court finds that there was a reasonable basis for identifying Mr. Morales and, consequently, its previous ruling was clear error. Accordingly, the Court does not reach the government's argument regarding *Strieff*.

I. **Under the Fourth Amendment, There Was Sufficient Basis for Mr. Morales' Identification.**

To suppress evidence as the fruit of an unlawful seizure, a person must first show (1) that his seizure or detention violated the Fourth Amendment, and then must show (2) that there is a "factual nexus" between the unlawful seizure and the challenged evidence. *United States v.*

5

*Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 184 (2014). Mr. Morales argued in his Motion to Suppress and supplemental brief that although there was a warrant for his arrest, the arresting officers lacked a reasonable basis for identifying him at the time of his arrest. [Doc. 23 at 6–7; Doc. 32 at 2–5]. In its previous order, the Court explained that identifications during an arrest pursuant to an arrest warrant are lawful if the arresting officer "(1) acts in good faith, and (2) has reasonable, articulable grounds to believe that the suspect is the intended arrestee." *Sanders*, 339 A.2d at 379; *see also United States v. McCray*, 468 F.2d 446 (10th Cir. 1972). [Doc. 37 at 12].

In *Sanders*, the District of Columbia Court of Appeals held that even when an officer mistakes the identity of the defendant, evidence seized during the arrest is admissible if the arresting officer acts in good faith and has reasonable, articulable grounds to believe that the suspect is the intended arrestee. 339 A.2d at 379. There, after observing Mr. Sanders, the officer suspected that he was trying to break into a car, so he asked Mr. Sanders for identification. *Id.* at 375. Mr. Sanders provided the officer with his identification card on which his last name was misspelled as "Saunders[.]" *Id.* The officer sent Mr. Sanders on his way and then radioed a dispatcher, providing the misspelled last name from the identification card and the correct date of birth. The dispatcher advised that there was an arrest warrant out for someone with the same name, matching the same physical description. *Id.* With this new information, the officer approached Mr. Sanders again and asked whether he had ever been arrested in the county that issued the arrest warrant, and the defendant replied that he had. *Id.* On this basis, the officer patted down Mr. Sanders, found a pistol and ammunition, and then arrested him. *Id.* After the arrest it was discovered that the arrest warrant was for another man, but Mr. Sanders was

nevertheless charged for the unregistered gun and unlawfully possessed ammunition that the officer had seized from him. *Id.* In affirming the lower court's denial of suppression of this seized evidence, the court reasoned that

> [W]here the warrant is constitutionally valid . . . the seizure of an individual other than the one against whom the warrant is outstanding is valid if the arresting officer (1) acts in good faith, and (2) has reasonable, articulable grounds to believe that the suspect is the intended arrestee. Should doubt as to the correct identity of the subject of warrant arise, the arresting officer obviously should make immediate reasonable efforts to confirm or deny the applicability of the warrant to the detained individual. If, after such reasonable efforts, the officer reasonably and in good faith believes that the suspect is the one against whom the warrant is outstanding, a protective frisk pursuant to the arrest of that person is not in contravention of the Fourth Amendment.

*Id.* at 379 (citing, *inter alia*, *United States v. McCray*, 468 F.2d 446 (10th Cir. 1972) (holding that arrest was lawful where FBI agent was notified that person named in arrest warrant was living at the specified address and the defendant, after being warned of his rights, admitted that his name was the same name given in the warrant)); *see also U.S. v. Glover*, 725 F.2d 120, 122 (D.C. Cir. 1984) ("The arrest of a person who is mistakenly thought to be someone else is valid if the arresting officer (a) has probable cause to arrest the person sought, and (b) reasonably believed the person arrested was the person sought."). As the Supreme Court stated in *Hill*, "[s]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before the court the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time." *Hill v. California*, 401 U.S. 797, 804 (1971).

This Court's previous Opinion held that the United States had failed to present reasonable grounds for its identification of Mr. Morales because "but for" the GPS identification, Deputy Segotta would have been unable to identify Mr. Morales. [Doc. 37 at 13 and 18]. This holding

misconstrued the meaning of the rule in *Sanders* requiring "reasonable, articulable grounds to believe that the suspect is the intended arrestee." *Sanders*, 339 A.2d at 379. As the United States points out, the "GPS data was not used to identify Morales," [Doc. 39 at 7], and indeed, "[o]fficers could not have positively identified Morales using only the GPS telephone data." *Id.* at 8. While the GPS data enabled the officers to "make observations of the people in the parking lot in order to actually identify Morales[,]" it did not form part of the basis for believing that the man officers saw in the car was Mr. Morales. *Id.*

The United States has enumerated several observations that allowed officers to identify Mr. Morales, the sum of which shows that the officers had good faith and reasonable, articulable grounds for believing that the man they decided to arrest was Steven Morales.

First, Deputy Segotta identified Mr. Morales' father, Arturo Morales. Deputy Segotta had been informed that Mr. Morales was traveling with his father, and he was able to see that the appearance of the driver of the car matched the driver's license photo of Arturo Morales. [Doc. 38 at 20–1]. Deputy Segotta testified that his vantage point of the car was less than 15 feet away and that he was able to see both sides of Arturo Morales' face. [Docs. 39 at 9, n.3; 38 at 21 and 44]. In light of this testimony, the Court committed clear error by finding that Deputy Segotta did not have enough information to identify Arturo Morales.

Second, in addition to observing and identifying Arturo Morales, Deputy Segotta noted that the car had a placard that read "Jack Key Motors," consistent with Deputy Segotta's knowledge that Jack Key Motors was located in Las Cruces and that Morales was from southern New Mexico and had traveled to Albuquerque from Las Cruces. [Doc. 38 at 15].

8

Third, Deputy Segotta observed an unknown individual with a tattooed arm concealed in the backseat of the vehicle, consistent with Deputy Segotta's understanding that Mr. Morales had a "tattoo sleeve" on his arm. [Doc. 38 at 16–20]. In sum, as Deputy Segotta testified, "based on the fact that the father was driving a vehicle that we believed had come from Las Cruces, New Mexico, based off the identifying information on the car, and that there was an adult male that was tattooed heavily from the hand down, that there was a very good likelihood that, inside that car, hiding in the back seat, was our suspect." [Doc. 38 at 22]. Once officers started converging on the car, Deputy Roberson, who was closer to Mr. Morales at the time of this confrontation, saw him through the windshield, testifying that "[i]t looked like the subject that was—very similar descriptors, if not the subject." [Doc. 38 at 63]. Deputy Roberson testified that although he did not specifically recall seeing Mr. Morales' photograph, he could not "recall if there's ever been a time where I haven't seen a picture of the subject that I'm about to arrest." *Id.* at 66.

The Court finds that under *Sanders*, the above testimony indicates that the arresting officers had good faith and a reasonable, articulable basis for believing that Mr. Morales was the same man as the person described in the arrest warrant. In particular, the rule in *Sanders* focuses on instances in which officers were *mistaken* as to an arrestee's identity. The fact that Mr. Morales is in fact the same person named in the arrest warrant further supports that the above observations by Deputies Segotta and Roberson were made in a good faith effort to arrest the correct person and formed a reasonable basis for believing that Mr. Morales was the correct person.

Mr. Morales argues that because the government has not specifically shown that the task force officers verified Mr. Morales' identity during the arrest, Mr. Morales' identification was

9

improper under *Sanders*. [Doc. 32 at 3]. Indeed, upon further questioning by the Court, Deputy Segotta clarified that once the task force vehicles moved in to surround the vehicle, he did not play a role in identifying Mr. Morales. [Doc. 38 at 52–56]. While Deputy Segotta testified that steps are taken, upon arrest, to confirm the identity of the arrestee, he did not have personal knowledge of such steps being taken in this instance. *Id.* at 58. Furthermore, during cross examination by defense counsel, Deputy Roberson testified that the task force officers approached the car with guns drawn because "the decision had already been made to arrest the person in the back of the car." *Id.* at 68–9. The Court rejects the argument that the Fourth Amendment required officers to do more to identify Mr. Morales because, in fact, there was no mistake as to Mr. Morales' identity. *Sanders* does not require that officers take steps to confirm the identity of the arrestee unless there is doubt as to the arrestee's identity. *Sanders*, 339 A.2d at 379; *Valdez v. U.S.*, 58 F. Supp. 3d 795, 817 (W.D. Mich. 2014). Because the correct person was arrested, the Court will not find that the government's failure to show that Mr. Morales' identity was confirmed at the very moment of his arrest amounts to a violation of the Fourth Amendment.

An examination of *State v. Lee*, 294 N.W.2d 547 (Wis. Ct. App. 1980), in which the Wisconsin Court of Appeals found that the arresting officers' identification of the defendant failed to satisfy the *Sanders* standard, further supports the Court's conclusion that there was no constitutional violation in Mr. Morales' identification. In *Lee*, the warrant's description of the arrestee was vague, stating only that the individual was "a young white man." *Id.* at 685. Because the warrant provided little basis for confirming that the defendant was the person named in the arrest warrant, the court held that "the police had no reasonable, articulable grounds to

10

believe that the suspect was the intended arrestee . . . [the] description is so general that it fits a very large group of ordinary young men." *Id.* In holding that the defendant's seizure violated the Fourth Amendment, the court further explained that "[t]he officers in this case had doubt as to the correct identity of the subject." *Id.* at 686.

By comparison, the officers who arrested Mr. Morales had physical descriptions and photographs of both Mr. Morales and his father and information that they were potentially traveling together [Doc. 38 at 12–13, 21], allowing them to identify and arrest Mr. Morales. Upon seeing Arturo Morales as well as a hidden male in the back of the car who had a "tattoo sleeve" on his arm, the officers had much more specific information with which to identify Steven Morales than the "young white man" description in *Lee*. At the evidentiary hearing, defense counsel pointed out while cross examining Deputy Segotta that a tattoo sleeve is "not unusual." [Doc. 38 at 42]. Indeed, had a "tattoo sleeve" been the only basis for identifying Mr. Morales, this basis would not be sufficiently reasonable and articulable under *Sanders* because it lacks a reasonable, let alone sufficient, probability that the individual being arrested is the person named in the warrant. *See Hill*, 401 U.S. at 804 ("[s]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment"). However, because Deputy Segotta was also able to identify Arturo Morales and observe that the car likely originated in Las Cruces, the combination of these observations gave rise to a "sufficient probability" that the man in the back seat of the car was Steven Morales. In sum, the connections that the officers drew between what they observed and the descriptive information they had been provided formed the reasonable and articulable basis for identifying and arresting Steven Morales.

believe that the suspect was the intended arrestee . . . [the] description is so general that it fits a very large group of ordinary young men." *Id.* In holding that the defendant's seizure violated the Fourth Amendment, the court further explained that "[t]he officers in this case had doubt as to the correct identity of the subject." *Id.* at 686.

By comparison, the officers who arrested Mr. Morales had physical descriptions and photographs of both Mr. Morales and his father and information that they were potentially traveling together [Doc. 38 at 12–13, 21], allowing them to identify and arrest Mr. Morales. Upon seeing Arturo Morales as well as a hidden male in the back of the car who had a "tattoo sleeve" on his arm, the officers had much more specific information with which to identify Steven Morales than the "young white man" description in *Lee*. At the evidentiary hearing, defense counsel pointed out while cross examining Deputy Segotta that a tattoo sleeve is "not unusual." [Doc. 38 at 42]. Indeed, had a "tattoo sleeve" been the only basis for identifying Mr. Morales, this basis would not be sufficiently reasonable and articulable under *Sanders* because it lacks a reasonable, let alone sufficient, probability that the individual being arrested is the person named in the warrant. *See Hill*, 401 U.S. at 804 ("[s]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment"). However, because Deputy Segotta was also able to identify Arturo Morales and observe that the car likely originated in Las Cruces, the combination of these observations gave rise to a "sufficient probability" that the man in the back seat of the car was Steven Morales. In sum, the connections that the officers drew between what they observed and the descriptive information they had been provided formed the reasonable and articulable basis for identifying and arresting Steven Morales.

Furthermore, the testimony from Deputies Segotta and Roberson, describing the observations they made and steps taken before arresting Mr. Morales, fail to indicate a lack of good faith to arrest the same person named in the arrest warrant. The Court finds that, on the issue of whether officers were seeking to arrest the person named in the arrest warrant, the testimonies of Deputies Segotta and Roberson were credible. Although Mr. Morales seems to argue that certain evidence was lacking to verify the testimony, such as the driver's license photo of Arturo Morales, [Doc. 32 at 4], this argument nevertheless fails to suggest, and nothing in the record indicates, that the task force officers were unconcerned with the identity of the person they arrested.

In sum, Mr. Morales' arguments fundamentally misconstrue *Sanders*, which does not require the task force officers to go through certain steps to verify Mr. Morales' identity while arresting him. *Sanders* only requires that "the tentative identification of a legitimate target was objectively reasonable." *Valdez*, 58 F. Supp. 3d at 817; *see also Hill*, 401 U.S. at 804. The Court agrees with Mr. Morales that "[t]he Fourth Amendment protects citizens against generalized, subjective decisions to arrest, as they could lead to violations of innocent persons' rights, and endanger the public." [Doc. 32 at 4]. However, as discussed above, the decision to arrest Mr. Morales had a sufficient basis and Mr. Morales was not "innocent" because he was in fact the correct person specified in the arrest warrant. Because the record does not raise doubt as to whether the man being arrested was Mr. Morales, the Court will not find that Mr. Morales' Fourth Amendment rights were violated simply because officers may not have taken all possible steps to confirm his identity while arresting him.

Furthermore, the GPS data, while directing the task force to the location of Mr. Morales' arrest, did not provide the basis for Mr. Morales' identification, which is the only aspect of Mr. Morales' arrest being disputed. The task force identified Mr. Morales based on Deputy Segotta's observations that Arturo Morales was in the car, that there was a man with a sleeve tattoo hiding in the car, that the car seemed to have originated in southern New Mexico, and based on Deputy Roberson's observation while approaching the car that Mr. Morales was inside. Because the observations supporting the task force's identification of Mr. Morales provide a reasonable, articulable basis for the identification and fail to suggest a lack of good faith in making the identification, Mr. Morales' Motion to Suppress must be denied.

CONCLUSION

Upon reconsideration, the Court revises its earlier statement of the law and finds that although the GPS data may have directed the task force to the location where they were able to identify and arrest Mr. Morales, only the visual observations made in the parking lot formed the basis of the identification. Because the identification was made in good faith and the observations formed a reasonable, articulable basis for believing that the person arrested was the same person named in the arrest warrant, the identification did not violate Mr. Morales' Fourth Amendment rights. Accordingly, the evidence seized during his arrest shall not be suppressed.

**IT IS THEREFORE ORDERED** that the United States Motion to Reconsider [Doc. 39] is **GRANTED** and, as a result, Mr. Morales' Motion to Suppress Evidence [Doc. 23] is **DENIED.**

DATED this 21th day of December, 2016.

_____
MARTHA VÁZQUEZ
United States District Judge

DAMON P. MARTINEZ
United States Attorney

SAMUEL A. HURTADO
Assistant United States Attorney

JASON BOWLES
*Attorney for Defendant*